USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___12/7/2018___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

DAVID CATALANO,

                    **Plaintiff,**

           -against-

NANCY BERRYHILL,

                 **Defendant.**

-----------------------------------------------------------------X

17-CV-7120 (SN)

**OPINION AND ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

    Plaintiff David Catalano brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff moves for judgment on the pleadings to reverse and remand the Commissioner's determination under Federal Rule of Civil Procedure 12(c). The Commissioner cross-moves to uphold the Commissioner's determination and dismiss the case.

    For the reasons discussed below, I find that the ALJ's determination that Plaintiff could perform a full range of work at all exertional levels was not supported by substantial evidence. I also find that the ALJ failed to fully develop the record of Plaintiff's exertional and nonexertional limitations. For these reasons, I GRANT the plaintiff's motion for judgment on the pleadings, VACATE the Commissioner's denial of benefits, and REMAND the case. I also DENY the Commissioner's cross-motion for judgment on the pleadings.

**BACKGROUND**

## I.     Mr. Catalano's Early Life

Mr. Catalano, who was born in 1953, reportedly has suffered anxiety since his childhood, which he describes as filled with difficulty and traumatic experiences. See Tr. at 63, 386. He reportedly had significant difficulty in school. See Tr. at 1066. He struggled, for example, to comprehend the subjects taught, he could not sit still, he became bored easily, he had poor concentration, and he had a low capacity to tolerate his ensuing frustration. See id. Due to these struggles, he attended special education classes throughout school before he dropped out without obtaining his high school degree. See Tr. at 181. His father used these struggles as a basis to verbally belittle him as a child. See Tr. at 1066.

## II.     Job History before Alleged Disability Onset

After Mr. Catalano dropped out of high school, he served in the Navy from 1973 to 1977. Tr. at 34, 386. During that time, he worked on an oiler in the engine room where he learned some of the skills necessary to become a mechanic. Tr. at 35.

It is unclear what work Plaintiff performed immediately after leaving the Navy, but Plaintiff did eventually gain employment as an auto mechanic from 1988-1991 and from 1994-2003.[1] See Tr. at 182. He reportedly left his job in late 2003 because of his anxiety. See Tr. at 2143. About a year earlier, he started having feelings of depression, low energy, low motivation, and more anxiety, and this made it difficult for him to handle the pressure of work. See Tr. at 386, 2143.

---

[1] Plaintiff's disability report states that he worked at Beacon Automotive from February 1994 to February 2004. See Tr. at 182. This is inconsistent, however, with other more contemporary records and testimony indicating that Plaintiff had left his job as a mechanic in late 2003. See, e.g., Tr. at 2143 (psychiatric note from December 2003 reporting that Plaintiff had left his job three months earlier).

**III.    Plaintiff's First Course of Treatment for Psychic Distress**

After Plaintiff's symptoms worsened in 2003, his internist prescribed a serotonin and norepinephrine reuptake inhibitor (an "SNRI") to take daily and Klonopin to take once daily as needed for his symptoms. See Tr. at 2143. Eventually, after he left his job as a mechanic, he also began seeing a psychiatrist, Dr. Win, at the Department of Veterans Affairs (the "VA") in December 2003. See Tr. at 2143. Plaintiff reported to Dr. Win that he was feeling better on his medication. See id. After this visit, Dr. Win assessed anxiety disorder.  Tr. at 2144. Although Dr. Win ruled out major depressive disorder during this first visit, see Tr. at 2144, Dr. Win later diagnosed Plaintiff with depression, see Tr. at 1186.

Dr. Win continued with Plaintiff's course of psychotropic medication, and Plaintiff saw Dr. Win roughly every two months from that first visit until February 2007. See Tr. at 433-60 (patient encounter summaries); see also Tr. at 1098-1105, 1107-09, 1115-16, 1118-20, 1142-44, 1151-62, 1164-66, 1176-81, 1186-87.

Throughout 2004 and early 2005, Plaintiff reported that he generally did well on his medications, that they helped him manage his anxiety, and that they did not give him any side effects. See Tr. at 1186-87 (psychiatric notes from January 23, 2004 noting that Plaintiff  "feels better with taking Effexor Xr and not taking a lot of klonopin, no episodes of anxiety symptoms"); Tr. at 1180 (psychiatric notes from March 2004 showing same); Tr. at 1179 (patient notes from June 2004 showing same); Tr. at 1176 (psychiatric notes from August 2004 reporting that Plaintiff "feels depressed once in a while but lesser than before"); Tr. at 1165 (psychiatric notes from November 2004 finding that Plaintiff had made "[m]oderate progress"); Tr. at 1161 (psychiatric notes from February 2005 showing same).

Indeed, Plaintiff apparently felt well enough during this period to keep looking for work. See Tr. at 1180 (patient notes from March 2004 indicating he was looking for a job at Home

Depot); Tr. at 1179 (patient notes from June 2004 indicating he was searching for a job).

Eventually, sometime in mid-2004, he found work again at a grocery store in its produce

department, which he felt was a job with lower stress. See Tr. at 1176 (psychiatric note from

August 2004 noting Plaintiff's employment). That job did not, however, last past 2004, see Tr. at

182, and although Plaintiff continued to look for work, see Tr. at 1161, he apparently never

found a part or full time job again.

Plaintiff was doing well enough by mid-2005 that Dr. Win began tapering Plaintiff off of

his SNRI. See Tr. at 1159 (psychiatric notes from May 2005 reporting that Plaintiff "tapering

effexor, he does not need Effexor at this time"). He responded well and eventually discontinued

the medication. See Tr. at 1157 (psychiatric notes from June 2005 reporting that he had a "few

episodes of anxiety but able to handle anxiety without problems" after discontinuing Effexor).

Later, however, Plaintiff's symptoms worsened and he went back on the medication. See

Tr. at 1154 (psychiatric notes from September 2005 noting that he "still has depression and

anxiety, discussed about restart effexor for his depression, he agrees" and that he had made

"minimal progress"). Dr. Win restarted Plaintiff on the medication and steadily increased his

dosage until Plaintiff again reported abated and stable symptoms similar to where they had been

before. See Tr. at 1152 (psychiatric notes from December 2005 noting that Plaintiff "still has

anxiety, will increase Effexor to get better responce [sic]") Tr. at 1143 (psychiatric notes from

February 2006 reporting that Plaintiff was responding well to increased dose); Tr. at 1119

(psychiatric notes from April 2006 showing same); Tr. at 1115 (psychiatric notes from June 2006

reporting that Plaintiff felt "slightly better with higher dose of effexor").

Eventually, Plaintiff felt well enough that he asked to go off the medication in August

2006. See Tr. at 1108. Dr. Win continued Plaintiff's prescription, but Plaintiff nevertheless

stopped taking his medication by December 2006. <u>See</u> Tr. at 1103. He reported to Dr. Win that he still had "ups and downs mood with afew [sic] anxiety," but that he was nevertheless "able to deal with his stress without any difficulties." Tr. at 1103. Plaintiff continued to do well off of the medication as late as February 2007. Tr. at 1099. Indeed, Plaintiff was doing well enough that he reported to Dr. Win that he was "functioning well without medication," and that although he still had "anxiety . . . [he was] able to manage without any problems." Tr. at 1099. At that time Plaintiff informed Dr. Win that he would stop returning for treatment because he was planning to move to Florida.

## IV.    Plaintiff's Second Course of Treatment for Psychic Distress

Plaintiff never did move to Florida. <u>See</u> Tr. at 386. But he also did not continue to see Dr. Win for treatment. <u>See id</u>. Instead, he went two and a half years without treatment before returning to the VA on October 28, 2009. <u>See id</u>.

On that day, Plaintiff saw Dr. Julianne Suojanen. <u>See id</u>. He told her that his anxiety had become so bad that he could no longer "go out into public to a restaurant," which he said his medication had helped him with before. <u>See id</u>. Dr. Suojanen observed that Plaintiff was "extremely self-critical and overly apologetic, expressing extreme guilt and low self esteem" and that Plaintiff appeared to be traumatized. <u>See id</u>. Dr. Suojanen also noted that Plaintiff reported OCD behaviors, such as checking faucets repeatedly. <u>See</u> Tr. at 386. Dr. Suojanen performed the Beck Anxiety Inventory, for which Plaintiff received a score of 26, signifying moderate-severe anxiety, as well as the Patient Health Questionnaire, the results of which were indicative of moderate-to-severe depression. Tr. at 387. In response, Dr. Soujanen prescribed the selective serotonin reuptake inhibitor ("SSRI") Zoloft to be taken daily as well as Klonopin to be taken daily as needed. When Plaintiff saw Dr. Suojanen again in November, he reported that he had "some reduction in anxiety symptoms as evidenced by increased ability to tolerate social

interaction without immediately becoming self-conscious, sensing others are making fun of him and that he is 'stupid.'" Tr. at 1066.

Later that month, Plaintiff saw a different psychiatrist, Dr. Lesniak. See Tr. at 379. During that visit, Plaintiff reported that his anxiety had "improved with the meds" and so had his OCD behaviors. Id. Dr. Lesniak assessed that Plaintiff was improving and increased his SSRI dosage. See Tr. at 381.

From then on, Plaintiff saw Dr. Lesniak roughly every two months from January 2010 through March 2014. See Tr. at 951-54, 967-92, 999-1006, 1013-15, 1022-41, 1422-35. Throughout this period, Plaintiff generally reported that the medication was working, making him feel less anxious, less depressed, and less obsessive-compulsive. See Tr. at 1039 (psychiatric note from January 2010 noting that Plaintiff "says he is doing better . . . decreased depression"); Tr. at 1037 (patient notes from March 2010 noting that Plaintiff "Says his anxiety has decreased . . . Says the ocd has also decreased. Feels down occasionally"); Tr. at 1035 (psychiatric note from May 2010 showing same); Tr. at 1033 (psychiatric note from July 2010 reporting that "Mr. Catalano says that he is doing much better."); Tr. at 1029 (psychiatric note from October 2010 showing same); Tr. at 1025 (psychiatric note from January 2011 showing same).

Eventually, though, Dr. Lesniak lessened his SSRI dosage in response to some adverse side effects, and Plaintiff's symptoms worsened. See Tr. at 1022 (psychiatric notes from April 2011 showing that Plaintiff reported "some increase in checking behavior"); Tr. at 1014 (psychiatric notes from May 2011 showing same); Tr. at 1008 (psychiatric notes from August 2011 showing same).

These compulsive behaviors increased enough that Plaintiff later asked to increase his SSRI dosage again, which helped him manage his symptoms better. See Tr. at 1006 (psychiatric

notes from September 2011); Tr. at 1001 (psychiatric notes from October 2011 noting that Plaintiff reports continued "anxiety in social situations but says this has improved"); Tr. at 999 (psychiatric notes from December 2011 showing continued improvement with higher dosage); Tr. at 991 (psychiatric notes from February 2012 showing same); Tr. at 987 (psychiatric notes from April 25, 2012 showing same); Tr. at 984 (psychiatric notes from June 2012 showing same); Tr. at 982 (psychiatric notes from August 2012 reporting same); Tr. at 979 (psychiatric notes from October 2012 reporting "a decrease in OCD, decreased checking, compulsions after the sertraline was increased . . . Reports decrease in anxiety"). Eventually, Plaintiff felt well enough that he decreased his dosage, and he was still able to manage his symptoms well at that lower dose. See Tr. at 975 (psychiatric notes from February 2013); Tr. at 972 (psychiatric notes from March 2013 reporting that his OCD was "not too bad and is improved from before"); Tr. at 967 (psychiatric notes from May 2013 reporting same); Tr. at 951 (psychiatric notes from July 2013 showing same); Tr. at 921-22 (psychiatric notes from October 2013 showing same); Tr. at 501-2 (psychiatric notes from December 2013 showing same); Tr. at 1422 (psychiatric notes from March 2014 reporting same); Tr. at 1418 (psychiatric notes from June 2014 showing same); Tr. at 1413 (psychiatric notes from October 2014 showing same); Tr. at 1407-8 (psychiatric notes from December 2014 showing same); Tr. at 1402 (psychiatric notes from March 2015 showing same); Tr. at 1397 (psychiatric notes from June 2015 showing same).

Plaintiff eventually experienced a worsening of his anxiety symptoms in September 2015, but this was managed by putting him back on Klonopin as needed. See Tr. at 1393. Afterwards, he reported that his OCD symptoms and depression continued to be manageable. See Tr. at

1388-9 (psychiatric notes from November 2015); Tr. at 1385 (patient notes from January 2016 showing same).

## V.     Physical Ailments

During the relevant period, Plaintiff has also experienced some joint pain, specifically in his lower back and left knee. This reported pain appears to be attributable to osteoarthritis.

The first record of his back pain is in July 2000, when an image was taken of his spine that revealed degenerative spondylosis of the lumbar spine, i.e., osteoarthritis in the spine. See Tr. at 674. Later, Plaintiff's back pain drove him to see Dr. Mark H. Hittman who assessed the most likely cause to be the degeneration of the spine. See Tr. at 1522. An image taken on that day confirmed that there was spondylotic degeneration. See Tr. at 671. His earlier image showed degeneration limited from L3 – L5, whereas this later scan showed degeneration ranging from L2 – S1. Compare Tr. at 671 with Tr. at 1522.

The earliest record of his knee pain comes from October 2, 2013, when he visited the emergency department with left knee pain and swelling that had persisted for several days. Tr. at 506-13. An image of Plaintiff's left knee showed what may have been a loose body as well as mild osteoarthritis and a small amount of fluid. Tr. at 336.  Afterwards, on November 6, 2013, Plaintiff saw Dr. Harvey Seigel for an orthopedic consultation regarding his left knee pain. Tr. at 367-68. Dr. Seigel noted that x-rays showed moderate degenerative joint disease and assessed osteoarthritis of the knee. Tr. at 369

## VI.    Plaintiff's Application for Benefits

Plaintiff applied for DIB and SSI payments in September 2014, alleging disability since December 31, 2003, due to a mental illness, anxiety, attention-deficit hyperactivity disorder, depression, being anti-social, a back injury, a left knee injury, and a liver injury. Tr. at 150-59, 180. The applications were denied initially and Plaintiff requested a hearing before an

administrative law judge ("ALJ"). Tr. at 92-93, 112-13. On April 11, 2016, Plaintiff appeared with counsel and testified before ALJ Kieran McCormack. Tr. at 25-71.

In addition to that testimony, the medical record, and Plaintiff's disability application, four experts offered opinion evidence via reports or testimony. The first expert opinion came from Dr. Litchmore, who performed an internal medicine consultative examination. Tr. at 1211-14. In his report, Dr. Litchmore relayed that he had identified no physical impairments, noting that Plaintiff had a full range of movement, and that he had full (5/5) motor strength. See id. Dr. Litchmore opined that Plaintiff had "no limitations in [his] ability to sit, stand, climb, push, pull, or carry heavy objects 15 pounds or less." Tr. at 1214. He added, however, that Plaintiff had marked limitations relating to his psychiatric condition that required further evaluation. Tr. at 1214

The second expert opinion was that of a state agency psychological consultant, Dr. Alpert, who reviewed Plaintiff's medical records and opined that:

> The totality of the data on file indicates that the claimant would have limits in his stress tolerance associated with limits in his persistence and pace. . . . [T]he claimant's psychiatric status does produce serious limitations as noted above but despite these limitations the claimant has the mental residual capacity to carry out work procedures with an adequate level of persistence and pace, relate adequately with coworkers and supervisors and tolerate the stress of full-time employment.

Tr. at 75-76, 88-89. Dr. Alpert never performed an examination of Plaintiff.

The third opinion was that of Plaintiff's internist, Dr. Kandala, whom Plaintiff visited for treatment about once a year. See Tr. at 480-87, 852-55, 1218-19, 1509-10, 2145-47. Dr. Kandala filled out a medical examination form and assessed Plaintiff with chronic back pain. See Tr. at

1218. He assessed that Plaintiff had moderate limitations in pushing, pulling, and bending. <u>See</u> Tr.at 1219.

Finally, the fourth opinion came from a vocational expert who testified during the hearing. During that hearing, the ALJ offered several hypotheticals to assess Plaintiff's capacity to obtain jobs available in the national economy. That expert opined that given Plaintiff's capacity for work, he could not perform his previous substantial gainful activity, but that he could perform some jobs such as that of mail clerk and ticket taker. <u>See</u> Tr. at 65. In response to that testimony, the ALJ asked the vocational expert to focus specifically on jobs that required more than the capacity to perform light physical work, as defined by regulation, because otherwise the Plaintiff would be *per se* eligible for benefits. <u>See id</u>. In response to that line of questioning, the vocational examiner opined that Plaintiff could perform the job of automobile detailer and laundry laborer. <u>See</u> Tr. at 65-66.

## VII. The ALJ's Decision

The ALJ denied Plaintiff's request for benefits. The ALJ first found that Plaintiff had not engaged in substantial gainful activity ("SGA") since December 31, 2003. Tr. at 13. He then found that Plaintiff had the severe impairments of anxiety, depression, social phobia, and obsessive compulsive disorder, but that his physical impairments were not severe. Tr. at 13. The ALJ concluded that none of these impairments met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. <u>See</u> Tr. at 21.

The ALJ then defined Plaintiff's residual functional capacity ("RFC") as the capacity:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work-related decisions with few, if any, workplace changes and where there is only

occasional interaction with supervisors, coworkers, and/or the general public.

Tr. at 15-16. At Step 4, based on the vocational expert's testimony, the ALJ found Plaintiff unable to perform any past relevant work. Tr. at 18. At Step 5, however, he found that Plaintiff could perform several representative jobs available in the national economy that required medium exertion such as automobile detailer and laundry laborer. Based on that testimony, he concluded that Plaintiff was not disabled under the statute. Tr. at 19-20.

## VIII.  Subsequent Appeal

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. See Tr. at 1-4, 147-49. Plaintiff initiated this action on September 19, 2017. See Compl. (ECF No. 1). Both parties consented to my jurisdiction, see ECF Nos. 11, 18, and they later filed cross motions for judgment on the pleadings, see ECF Nos. 21, 24.

## APPLICABLE LAW

## I.  Definition of Disability

A claimant is disabled under the Social Security Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. §§ 423(d)(3), 1382c(a)(3)(D). A claimant will be determined to be disabled only if the "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013).

## II.    Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, 47 F.3d 14, 16 (2d Cir. 1995). The court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing." 42

U.S.C. § 405(g). The court may set aside the Commissioner's decision only if "it is based upon

legal error or is not supported by substantial evidence." Rosa v. Callahan, 168 F.3d 72, 77 (2d

Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)). Substantial evidence is

"'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004)

(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

## DISCUSSION

Plaintiff offers two overall bases for remand. First, he argues that the ALJ failed to fulfill

his duty of developing the record. Second, he argues that the ALJ's RFC determination and the

subsequent hypotheticals posed to the vocational expert lacked the support of substantial

evidence. Defendant disputes both bases for remand.

For the reasons discussed below, the Court agrees with both arguments. The ALJ's

conclusion that Plaintiff could perform work at all exertional levels lacked a basis in substantial

evidence, and the ALJ failed to develop the record fully in order to properly assess how

Plaintiff's exertional and nonexertional limitations eroded his RFC. The Court, therefore, must

remand for further fact-finding.

## I.     The Exertional RFC was not Supported by Substantial Evidence

After reviewing the evidence, the ALJ determined that Plaintiff had the residual

functional capacity "to perform a full range of work at all exertional levels. . . ." Tr. at 15.

Plaintiff argues that this determination was not supported by substantial evidence, and that this

error requires remand for further proceedings. Pl.'s Mem. at 21 (ECF No. 23). The

Commissioner disagrees, arguing that the ALJ's finding was supported by the consultative

examination and the extensive medical record. Def.'s Opp. at 21-25 (ECF No. 25). For the reasons discussed below, the Court agrees with Plaintiff.

The ALJ's conclusion that Plaintiff could perform work at *all* exertional levels is a lofty assessment of Plaintiff's physical health unsupported by substantial evidence in the record. The regulations define five categories of exertional capacity: sedentary, light, medium, heavy, and very heavy. See 20 C.F.R. § 404.1567. Each category is defined by the amount of weight that a claimant can lift and carry. See id. Thus, by concluding that Plaintiff could perform work at all of these levels, the ALJ implicitly determined that Plaintiff could also perform very heavy work, which is defined as "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. § 404.1567(e).

At the time he applied for disability benefits, Plaintiff was 60 years old, see Tr. at 19, had degenerating bones and osteoarthritis in his knee and spine, see Tr. at 633, 670-1, 674, 1016, and had an "overweight" BMI, see Tr. at 618. One of his treating physicians, Dr. Kandala, had indicated that he had moderate limitations in lifting, carrying, pushing, pulling, and bending. See Tr. at 1219. And the consultative examiner concluded that "Plaintiff had "no limitations in [his] ability to sit, stand, climb, push, pull, or carry heavy objects 15 pounds or less," Tr. at 1214, which strongly suggests that Plaintiff had at least some limitations in manipulating objects over 15 pounds, see Fraser v. Comm'r of Soc. Sec., 2013 U.S. Dist. LEXIS 164702, at *16 (E.D. Cal. Nov. 18, 2013) ("If the most Dr. Spellman can say is that Plaintiff is 'definitely' not limited to sedentary work, it is unlikely that Plaintiff is capable of lifting and carrying 100 pounds.").

Given this record, a reasonable mind would suspect that Plaintiff has at least *some* limitation on his ability to lift and carry heavy weight. The ALJ, however, concluded otherwise. He discounted the consultative examiner's conclusion because it was "inconsistent with the

examiner's completely normal physical examination of the claimant and with the totality of the rest of the medical evidence." Tr. at 13. As for the treating physician, the ALJ dismissed it "because no explanations are provided . . . . [and it] is also inconsistent with treatment records that found no physical limitations." Tr. at 14.

There are two flaws to the ALJ's logic. First, the ALJ did not consider that Dr. Kandala's opinion was from a treating physician, and his cursory treatment of the opinion is insufficient to overcome the presumption that a treating physician's conclusions are accurate. See Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (holding that "to override the opinion of a treating physician . . . the ALJ must explicitly consider" six factors). This alone is a sufficient basis for remand. See Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) ("The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citation and quotation marks omitted).[2]

Second, the ALJ's appears to have assumed that "a claimant who does not suffer any exertional limitations can be presumed to be capable of lifting and carrying 100 pounds occasionally and 50 pounds frequently." Fraser v. Comm'r of Soc. Sec., 2013 U.S. Dist. LEXIS 164702, at *15-16 (E.D. Cal. Nov. 18, 2013). That presumption is flawed, however, because "a person without any medically recognizable impairments may be unable to lift and carry such weights." Id.

---

[2] In his brief, the Commissioner defends the ALJ's decision as harmless error by pointing to some instances of Plaintiff reporting a lack of pain. See, e.g., Tr. at 485. But a few chart notes of "[n]o joint pain, [n]o acute or chronic back pain," is not enough to dismiss Dr. Kandala's opinion without thorough consideration. See Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). That is especially true here because there is ample evidence that Plaintiff did have pain in his knee and back, and that he suffered from degeneration consistent with those symptoms. See, e.g., Tr. at 674; Tr. at 671; Tr. at 336; Tr. at 333.

Third, the treatment records *do not* in fact show that Plaintiff had no impairments on his exertional capacity. The Court can only see two possible sources for such a conclusion, but neither constitutes substantial evidence. First, there is the body of the consultative examiner's report, which states that Plaintiff had "5/5 [strength] in the upper and lower extremities" as well as 5/5 grip strength. *See* Tr. at 1213-1214. That statement, however, cannot be read literally. Clearly, "5/5" cannot mean that Plaintiff—at 60 years old—had the *maximum* strength humanly possible. Rather, the "5/5" assessments must stand for Plaintiff's ability to lift something less, rendering it much too vague to map that conclusion onto an assessment of Plaintiff's capacity to lift as much as 100 pounds. *Compare with* Lewis v. Comm'r of Soc. Sec., 2018 U.S. Dist. LEXIS 6902, at *9 (N.D.N.Y. Jan. 16, 2018) (finding that substantial evidence supported conclusion that Plaintiff could perform medium work because "Dr. Goldstein opined that based on a review of the medical evidence in the record, Plaintiff could occasionally lift and carry up to 50 pounds and could frequently lift and carry up to 20 pounds").

Support for the conclusion that Plaintiff has no exertional limitations can also be found in Plaintiff's application paperwork. There, he reported that in some of the earlier jobs held from 1988 – 2004 he frequently lifted weight ranging from 20 to 50 pounds, and that he lifted objects weighing up to 100 pounds or more. See Tr. at 205-209. That evidence does suggest that Plaintiff could, at one point in time, perform very heavy work. But it is also subjective and predates evidence of degeneration in his knee and spine. Compare Tr. at 206 (report that Plaintiff performed very heavy work at a job he left in 2004) with Tr. at 671 (record of image, taken on May 23, 2011, because of back pain, showing "spondylotic degenerative changes") and with Tr. at 336 (record of image, taken on October 2, 2013, because of a swollen and painful left knee, showing that Plaintiff had osteoarthritis) and with Tr. at 333 (record of image, taken on

November 6, 2013, because of painful knee swelling, showing that Plaintiff had osteoarthritis). It does not, therefore, constitute substantial evidence sufficient to justify the ALJ's decision without other, more recent evidence. Accord Rivera v. Barnhart, 2005 U.S. Dist. LEXIS 36968, at *34-36 (W.D.N.Y. Dec. 9, 2005) (finding that decision plaintiff could perform work at medium exertional level was not supported by substantial evidence when only evidence of ability to lift close to fifty pounds came from plaintiff's subjective testimony about work performed thirteen years prior).

Thus, there was significant reason to believe that Plaintiff's capacity to manipulate objects of heavy weight had degenerated since 2004; objective evidence showed worsening osteoarthritis in the spine and knee, and his treating physician had assessed Plaintiff with "moderate" exertional limitations. There was not, therefore, substantial evidence to support the conclusion that Plaintiff could perform work at all exertional levels.

## II.    The ALJ Failed to Develop the Record with Regards to Plaintiff's Exertional Limitations

The finding that the ALJ's determination lacked support from substantial evidence does not necessarily demand remand. Instead, so long as the hypotheticals posed to the vocational expert were justified by substantial evidence, the Court could affirm his decision as harmless error. See, e.g., Akey v. Astrue, 467 F. App'x 15, 17 (2d Cir. 2012) ("The ALJ's failure to include the limitation to unskilled and semi-skilled work is harmless because the only jobs the vocational expert identified were unskilled or semi-skilled."). But, the Court cannot determine whether the RFC determination was harmless error here because there are significant gaps in the record. The ALJ, therefore, failed to fulfill his duty to develop the record, and the Court must remand Plaintiff's case for further fact-finding.

The dispositive question here is whether Plaintiff can perform work requiring medium exertion. This is because the regulations provide that certain applicants matching an age, education, and work experience profile "grid out," meaning that they are *per se* disabled. See 20 C.F.R. § 404, subpt. P, app. 2. Because Plaintiff is of advanced age and limited education, he would "grid out" if he is limited to light work or less. See 20 C.F.R. § 404, subpt. P, app. 2, rule 202.02 20. He would not, however, if he can perform work requiring medium exertion. See 20 C.F.R. § 404, subpt. P, app. 2, rule 203.12; see also Tr. at 65. This is why the ALJ specifically asked the vocational examiner for positions available in the national economy requiring medium exertion. See Tr. at 65-66. Thus, Plaintiff's eligibility hinges on whether he is limited to manipulating objects ranging from 25 to 50 pounds or more (medium exertion and up) or if he is instead limited to objects weighing no more than 10 to 20 pounds (light exertion). See 20 C.F.R. § 404.1567(b), (c).

As discussed *supra*, however, the record is indeterminate on this point. There is ample indication that Plaintiff has some limitations. The consultative examiner opined on Plaintiff's ability to manipulate up to fifteen pounds, which suggests that he has limitations over that amount, see Fraser, 2013 U.S. Dist. LEXIS 164702, at *16, but also offers no help in determining where those limitations lie. His treating physician opined that he has moderate exertional limitations in general, see Tr. at 1218, but that opinion cannot be translated to a specific weight classification. See Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (finding that doctor's report could not support a finding of exertional capacity because it was "remarkably vague. . . . [and what it] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation"). There would have been, therefore, insufficient evidence in this record for the ALJ to conclude that Plaintiff could perform work requiring medium exertion. See id. (reversing

finding that plaintiff could perform light work based on doctor's vague opinion); Laureano v. Comm'r of Soc. Sec., 2018 U.S. Dist. LEXIS 165809, at *43-44 (S.D.N.Y. Sep. 26, 2018) (finding same because "neither Dr. Axline nor Dr. Mescon made specific findings regarding Laureano's ability . . . to lift."); Bowers v. Comm'r of Soc. Sec., 2018 U.S. Dist. LEXIS 12590, at *13-15 (N.D.N.Y. Jan. 26, 2018) (finding that determination of capacity to perform medium work lacked support of substantial evidence because "a careful review of the record reveals no evidence which could support the finding that Plaintiff could lift up to 50 pounds and frequent[ly] lift and carry 25 pounds"); Rivera, 2005 U.S. Dist. LEXIS 36968, at *34-36 (finding same because there was no evidence to support the ALJ's conclusion that plaintiff is capable of . . . lifting 50 occasionally"). Thus, it is impossible to say whether the exertional RFC determination was harmless error.

Given this gap in evidence, the ALJ should have developed the record further. See Selian, 708 F.3d at 421 ("At a minimum, the ALJ likely should have contacted Dr. Naughten and sought clarification of his report.") (citation omitted); Melendez v. Astrue, 630 F. Supp. 2d 308, 314-15 (S.D.N.Y. 2009) (finding that ALJ had not fulfilled legal obligation to fully develop the record when a doctor's report "indicated that Melendez could be expected to stand and/or walk for less than two hours in an eight hour workday. . . . [leaving it] unclear how much fewer than two hours he thinks Melendez has the capacity to stand and/or walk"). The Court must, therefore, order remand for further fact-finding into Plaintiff's RFC to perform work requiring medium exertion.

## III.    The ALJ also Failed to Develop the Record of Plaintiff's Nonexertional Limitations

Plaintiff also argues that the ALJ failed to fulfill his duty to develop the record fully with regard to his non-exertional impairments. Pl.s' Mem. at 18-21. Specifically, Plaintiff claims that no one assessed how Plaintiff's severe mental impairments impacted his ability to perform work. Id. Defendant disagrees, arguing that Dr. Alpert's non-examining opinion was sufficient

evidence for the ALJ to reach a conclusion. Def.'s Opp. at 17-18. For the reasons discussed below, the Court agrees with Plaintiff.

Unlike a trial judge, a social security ALJ "must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). And in cases like Mr. Catalano's that involve mental impairments, the regulations specifically "require a robust examination that is sensitive to the dynamism of mental illnesses and the coping mechanisms that claimants develop to manage them." Corporan v. Comm'r of Soc. Sec., 2014 U.S. Dist. LEXIS 180996, at *43-44 (S.D.N.Y. Mar. 27, 2014) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00). Such cases require particular attention "because persons with mental illnesses 'adopt a highly restricted and/or inflexible lifestyle within which they appear to function well.'" Id. (quoting SSR 85-15, 1985 SSR LEXIS 20). These structured "structured settings . . . [allow claimants] to function adequately 'by lowering psychological pressures, by medication, and by support from services.'" Id. For that reason, an ALJ is required to consider the evidence in light of "the characteristics of any structured setting . . . and the effects of any treatment." 20 CFR 404 App. 1 Subpt. P. App. 1, § 12.00(D)(1).

Defendant claims that Dr. Alpert's opinion satisfies this duty. In that report, Dr. Alpert summarizes the admittedly extensive psychiatric records from the VA before concluding:

> The totality of the data on file indicates that the claimant would have limits in his stress tolerance associated with limits in his persistence and pace. . . . [T]he claimant's psychiatric status does produce serious limitations as noted above but despite these limitations the claimant has the mental residual capacity to carry out work procedures with an adequate level of persistence and pace, relate adequately with coworkers and supervisors and tolerate the stress of full-time employment.

Tr. at 75-76, 88-89.

Superficially, this report appears to consider how Plaintiff's severe mental impairments affected his capacity to work, just as Defendant says. But this opinion is based entirely on a review of the VA records, and nothing in those records suggest that Plaintiff, despite his limitations, can "tolerate the stress of full-time employment." Tr. at 76. The records of Plaintiff's mental health treatment begin shortly after he left his job because his anxiety and depression made it difficult for him to handle the pressure of work. See Tr. at 386, 2143. Since then, his mental health treatment has overlapped with only one, brief period of employment in a produce department, a job that Plaintiff described as "low stress" but that nevertheless did not last more than a few months. See Tr. at 1176. Dr. Alpert's conclusion, therefore, is based entirely on how Plaintiff's symptoms became stable within the "highly restricted and/or inflexible lifestyle within which [he] appear[ed] to function well.'" Corporan, 2014 U.S. Dist. LEXIS 180996, at *44 (citation omitted). That is not evidence of how Plaintiff's symptoms would manifest in the context of full-time employment.

The jump between Dr. Alpert's opinion and the ALJ's RFC determination underscores this point. Dr. Alpert, after reviewing the records, simply concluded that Plaintiff could "relate adequately with coworkers and supervisors and tolerate the stress of full-time employment." Tr. at 75. From that statement, the ALJ concluded that he could:

> work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work-related decisions with few, if any, workplace changes and where there is only occasional interaction with supervisors, coworkers, and/or the general public.

Tr. at 15-16. This opinion, which is much more specific than Dr. Alpert's, suggests that the ALJ dug through the longitudinal records himself to assess Plaintiff's capacity to adapt to the stressors of work, and such an independent determination of Plaintiff's specific capacity for stress was beyond the scope of the ALJ's discretion. See Manson v. Colvin, 2016 U.S. Dist.

LEXIS 127080, 2016 WL 4991608, at *11 (N.D.N.Y. Sept. 19, 2016) ("[A]n ALJ cannot assess

a plaintiff's RFC based on the ALJ's own interpretation of the medical evidence" (citing

Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998))).

Instead of drawing his own conclusions and presenting them to the vocational expert, the

ALJ should have sought out an expert opinion, perhaps from a consultative examiner or from one

of the psychiatrists who had treated plaintiff for years. The ALJ did not do so, however, and this

is a cause for remand. See Scheurer v. Berryhill, 269 F. Supp. 3d 66, 86-87 (W.D.N.Y. 2017)

(citations omitted) (remanding because the ALJ based the denial of benefits on expert opinions

that "did not account for how [the plaintiff] would specifically react to an employment setting");

see also Lancellotta v. Secretary of Health and Human Services, 806 F.2d 284, 285 (1st Cir.

1986) ("Without an evaluation of claimant's vocational abilities in light of [her diagnosis of

bipolar disorder], there is no basis for the ALJ's conclusion that [she] can perform low stress

work."); Durrett v. Apfel, 2000 U.S. Dist. LEXIS 7388, 2000 WL 680430, at *7 (S.D. Ind. Mar.

27, 2000) ("Both Lancellota  and Social Security Rule 85-15, 1985 SSR LEXIS 20 require the

ALJ to consider the effect of stress on the individual claimant and not to make unsupported

conclusions regarding a claimant's ability to cope with stress."). The Court, therefore, must

remand for further fact-finding.

## CONCLUSION

Accordingly, I GRANT Plaintiff Catalano's motion for judgment on the pleadings, ECF

No. 21, VACATE the Commissioner's denial of benefits, and REMAND the case to the

Commissioner for further fact-finding into Plaintiff Catalano's capacity to perform work

requiring medium exertion and the effect that work would have on his nonexertional symptoms.

In addition, I DENY the Commissioner's cross-motion for judgment on the pleadings, ECF No. 24.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      December 7, 2018
            New York, New York